**Paul BRATTOLI, Plaintiff,**

v.

**Theodore W. KHEEL and Raymond J. Scully as Trustees in Bankruptcy for A. H. Bull Steamship Company, pursuant to Chapter 10 of the Bankruptcy Act, Defendant and Third Party Plaintiff,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., Third Party Defendant.**

**No. 65–ADM–606.**

United States District Court
E. D. New York.
March 11, 1969.

Sergi & Fetell, Brooklyn, N. Y., for plaintiff; by Benjamin J. Sergi, Brooklyn, N. Y., of counsel.

Kirlin, Campbell & Keating, New York City, for defendant and third-party plaintiff; by Daniel J. Dougherty, James R. Campbell, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for third-party defendant; by Henry V. Kerr, New York City, of counsel.

JUDD, District Judge.

## OPINION AND FINDINGS

This case, tried without a jury, presents the claim of a longshoreman who was hit in the back of the head and neck by pieces of rigging when the inshore pendant of a cargo boom parted. He charges the vessel, the S. S. Kathryn of Bull Lines, with unseaworthiness and negligence. The vessel in turn seeks indemnity and attorneys' fees from the longshoreman's employer, International Terminal Operators Co., Inc. (I.T.O.).

Liability as between the vessel and I. T.O. depends on whether the pendant broke simply because the steel cable forming the pendant had rusted away, or whether the break was caused by a "tug-of-war" resulting from improper application of force to the rigging.

## FACTS

The accident occurred in the afternoon of December 1, 1960, while the jumbo boom at the No. 4 hatch was being used to load containers, vans of about eight or nine tons weight.

### The Rigging

Consideration of the evidence must begin with a description of the rigging involved in the accident. The boom in use was at the inshore (port) side of the aft end of the No. 4 hatch.

The lateral movement of the boom was provided by two electric winches located at the forward end of the hatch, and connected to the head of the boom by manila ropes leading to steel cables, sometimes termed guy pendants. A manila rope of 1⅛ inch diameter, ran from each winch, through a snatch-block located near the forward corner of the hatch, one on the port side and one on the starboard. The rope went from

these blocks, along the deck, to other snatch-blocks located near the aft corners of the hatch, and then through a block and tackle arrangement which was attached to the lateral guy pendants, each approximately 15 feet long, made of $\frac{7}{8}$ths inch steel cable. These pendants were permanently attached to the boom. One reason for having a steel cable at the head of the boom was to permit shorter parts in the block and tackle, which operates in accordion fashion to pull the boom over or to release it.

The two winches at the forward end of the hatch are placed three or four feet from one another, and can be operated by a single individual. Testimony was unanimous that proper procedure for slewing a boom is to have the winch which is not applying the lateral force pay out the rope fast enough so that no stress develops between the lateral guys, and slowly enough so that no coils accumulate on the deck. Proper coordination of the two winches is an art.

The controllers or handles of the two winch motors are upright in neutral, and can be moved forward from one to five notches to pay out line or backward to take in line. When the controller is brought to neutral, a brake is automatically set on the winch-drum by electricity. This can stop the line instantly.

Although the evidence is in conflict, I find that it was good practice to have one man operate the two forward winches.

There are cradles on the deck, in which each boom can be placed when it is lowered to a horizontal position.

Diagrams submitted by the parties helped to explain the arrangement to the court.

The S. S. Kathryn was a C–2 vessel, of World War II vintage, but the jumbo booms for container loading were added in late 1959, and began operations early in 1960.

These additional facts will be referred to in the discussion.

1. A force of not more than a few hundred pounds was sufficient to move the unloaded boom laterally.

2. In good condition, $1\frac{1}{8}$ths inch manila rope will break at about 12,000 pounds stress, and $\frac{7}{8}$ths inch wire rope at about 46,500 pounds. The safe working load of rope components is considered to be one fifth of the breaking strength. There is thus no question that, if in good condition, the materials were adequate for the job.

3. The $\frac{7}{8}$ths inch cable was made of six cables of 19 strands each.

4. One of libellant's jobs as signalman was to coordinate the operation of the winches.

*Operations on the Day of the Accident*

During the morning of December 1, 1960, a gang of stevedores had been at work loading general cargo into the No. 4 hatch, using a boom at the forward end of the hatch. The ship's crew then set up the port jumbo boom for loading containers, and the longshoremen put the snatch-blocks in position and ran the guy lines into the forward winch-drums.

The United States Department of Labor's Safety and Health Regulations for Longshoremen require that stevedores inspect the gear they are to use. The guy pendant, however, stands about fifty feet above the deck, at the top of the boom, and the boom was not lowered. It is clear that no on-deck inspection was made.

Loading of containers began after the jumbo boom was rigged, and one van was loaded without any difficulty.

The port jumbo boom was swung over the pier, and a loaded container was lifted, moved over the hatch, and placed on board in the tween-decks. Libellant watched the loading operation, standing near the coaming of the hatch. When the container was properly stowed, he signalled the aft winchman (who controlled the vertical movement of the boom) to raise the topping-lift and the cargo-runner, so that the hook would

clear the deck rail when the boom was returned to pick up the next container.

When the hook was in position, the libellant motioned to the forward winchman to slew the boom toward the pier. As the boom moved to port, he noted that the starboard guy was slack. At this moment, he turned and walked toward the rail of the ship, so that he could help plumb the boom-head above the next van.

### The Accident

While he was walking toward the rail, libellant was hit on the back of the head, neck, and left shoulder, and fell unconscious and face down, lying across sections of the hatch cover which were piled near the rail. The aft winchman heard a noise, and hurried to the scene. It is not clear whether libellant was hit by the wire, the rope or a block, but it seems probable that it was a block, for he was hit hard but did not bleed.

The gear from the port guy was lying near libellant when members of his gang and of the ship's crew reached him. He was lifted up, taken in an ambulance to the hospital, X–rayed, kept there under medication for three days, and sent home in a taxicab.

The attending physician discharged libellant from his care in March, 1961, but dizzy spells and headaches prevented his returning to work until September, 1961. He is now fully recovered, with minor residual consequences to be discussed later.

### The Guy Pendant

The port pendant, the wire-rope segment of the guy, had parted at a point about eighteen inches above the upper block. After the accident, it was replaced with a new pendant supplied by the stevedores, and work resumed in about thirty minutes.

The lower piece of the pendant was kept by International Terminal Operating Co., Inc., taken to their office, and then stored in their gearshed on Pier 21.

Another stevedoring company had the contract for Pier 21 during part of the period intervening between the accident and the trial, but the piece of wire was apparently overlooked at the time of transfer. It could not be produced at the trial.

The upper section of the pendant was taken by a representative of Bull Line. A marine tester was given a thirteen foot section of $7/8$ ths inch wire rope by a Bull Line employee a few days later. He observed that the loose end was frayed, indicating a tensile break, that the loose ends of wire seemed clean and bright, and that the surface of the wire was greasy from lubricant. He tested a piece of the wire rope near the center of the thirteen foot section, and found that it withstood about 26,000 pounds of pull before breaking. This was about half the normal tensile strength of such wire, but the cables composing the rope were separated before the test, as the result of the original break. The tester's laboratory was damaged by fire a few years later, and the wire was not available at the trial. While there is a gap in identifying the rope segment, I am satisfied, as discussed later, that it may be considered as evidence in this case.

An I.T.O. employee who had looked at the wire rope right after the accident testified that it was rusted, and the center was corroded. An expert for I.T.O. testified that corrosion was most rapid in the lower end of a standing wire rope like the pendant, and could arise from moisture accumulating in the lower part of the core, destroying the hemp center of the wire rope and weakening the inner cable. He told of seeing steel "components" break of their own weight after years of service. But there was no testimony that steel cable would break without stress or that the gear on the jumbo boom was old enough to have deteriorated to that extent.

The test made for Bull Line was of a piece in the upper portion of the pendant, and therefore would not reveal corrosion near the bottom. Nor was the

condition of the hemp center at the break mentioned in the report.

I conclude that the lower end of the port guy pendant was below its initial strength, but that it would not have broken without some abnormal stress.

### Tug-of-War or Tight-lining

The phrase tug-of-war is an appropriate description of the situation involved in this case, where winches were operating lines on both sides of the boom. The I.T.O. expert distinguished this from tight-lining, the problem that arises when port and starboard guys on married falls are pulling in opposite directions. In the operation of a single boom, the two guys pull at an angle to each other.

If the starboard guy were reversed or braked while the port guy was hauling in, it would place severe stress, perhaps as much as 48,000 pounds, on the two guys. The same thing would happen if the topping-lift were raised while either guy was being taken in—a less likely situation, since the topping-lift should require no change until it is lowered when the boom is in position over the pier. Either type of tug-of-war would exert instantaneous stress, sufficient to break a ⅞ths inch wire rope.

The I.T.O. expert asserted that, because of the various stresses involved, at different angles, the boom itself would collapse, or some other part would give way, before a pendant in good condition failed, but he admitted that the circumstances may differ in each case, and that many different parts have failed on different occasions. In this case, the fact that the port guy had performed the same cycle without incident in moving the boom over the pier to pick up the first van, suggests that something different happened the second time, to cause the accident.

The stevedoring concern, conscious of the "tug-of-war" problem, had five employees sign a statement shortly after the accident that there was no stress or strain. Even a man who did not see the boom turning, and one who could not read the statement, were among the signers. The forward winchman did not sign, was not called as a witness, and is said to have retired.

■ The trial took place eight years after the accident, and the evidence leaves some gaps. None of the witnesses was watching the boom when the pendant broke. Therefore, the decision must rest largely on inferences from various bits of testimony. Libellant saw slack in the starboard line the last time he looked, and he "imagined" the boom was moving after he turned away, because he saw the hook swinging. But a break could occur in the time it took him to make one step. The oral testimony is not clear concerning the exact moment of the accident. In any event, it cannot prevail over objective facts. The objective facts persuade me that the pendant would not have broken without abnormal stress caused by some failure of coordination of the various winches.

The accident was therefore caused by operational negligence superimposed on a weakened condition of the guy pendant. Both causes have been treated as unseaworthiness, under the authorities cited below.

### Brattoli's Injuries and his Present Condition

■ The libellant undoubtedly suffered contusion and concussion of the skull, affecting also his neck and left shoulder. A man of less strength might have suffered even more severely from a similar blow. X–ray findings were negative. No bone or vertebra was broken, but he suffered severe and long-lasting pain. During his hospitalization he required administration of a very strong pain killer. He was required to take heat treatments for several months.

Even after he returned to work, libellant was subject to dizzy spells and loss of balance, which made it impossible for him to climb ladders, and impaired his earning capacity to some degree. His

total loss of earnings, over a 63 week period was approximately $8,000.

Examinations made by a physician for the vessel in June, 1962 and again in June, 1967, when the case was first called for trial, showed no objective evidence of any continuing injury. Libellant still complains of pain and headaches, however, and his own physician reported that there was some limitation of mobility of the left shoulder. While pain is subjective, it may be real even in the absence of X–ray evidence to justify it.

At the time of the trial, libellant appeared to be strong and healthy. He weighs 200 pounds. He is back on the same job he held before, with the same gang. I find that libellant has a slight, permanent injury to his left shoulder, but that it does not cause any appreciable disability.

The sum of $30,000 is found to constitute full compensation for pain and suffering, permanent injury, loss of earnings, and medical and hospital expenses. The judgment may provide for repayment of any sums advanced under the Longshoremen's and Harbor Workers' Compensation Act.

## LAW

Legal problems which must be considered deal with the defense of laches, the vessel's liability for unseaworthiness, the admissibility of the tester's report, and the vessel's right of indemnity from the stevedore.

### Laches

■ The vessel pleaded a defense of laches, but no evidence was offered on this specific issue.

The pleadings showed that the first action based on the accident was brought in 1962, and was stayed for two years by an order of the bankruptcy court, Bull Lines having been subject to an Article X reorganization proceeding which is still pending.

Time has increased the gaps in the evidence, by dispersal of personnel and records of both the vessel and the stevedore. Better evidence of the condition of the guy pendant might have been available at an earlier time.

On the other hand, more diligence by the vessel and the stevedore could have avoided most of the consequences of delay. They were fully aware of the claim, and obtained statements of witnesses shortly after the accident.

Libellant should not suffer because his adversaries have not preserved all defense material or kept track of all potential witnesses. I do not find any basis for sustaining the defense of laches.

### Unseaworthiness

■■ A vessel is responsible for injury caused by any defect in hull, equipment, or gear, even without evidence of fault. The owner owes an absolute duty to provide seaworthy appliances. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Grillea v. United States, 232 F.2d 919 (2d Cir. 1956).

The former distinction between unseaworthiness and operational negligence has been obliterated by the recent decision in Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967). Liability was imposed on the vessel in that case in spite of the fact that the trial court had found that "[T]he accident was caused solely by the negligent operation of the stevedoring crew using seaworthy equipment. * * *" Mascuilli v. United States, 241 F.Supp. 354, 362 (E.D.Pa.1965), and that the Third Circuit Court of Appeals had affirmed this finding (358 F.2d 133 [1966]). In its memorandum decision reversing the lower court's exoneration of the vessel (Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705 [1967]), the Supreme Court presumably accepted the trial court's finding of fact. It is noteworthy that *Mascuilli* also involved the simultaneous tightening of two lines on a loading boom, causing the accident so

instantaneously that no warning could be given (241 F.Supp. at 362).

 This Circuit has interpreted the *Mascuilli* case as meaning that negligence of a stevedore, by itself, is sufficient to render a ship unseaworthy. In Candiano v. Moore-McCormack Lines, 382 F.2d 961 (2d Cir.1967), liability was imposed on the owner, and indemnity required from the stevedore, even though the injury to the longshoreman was caused by the failure of fellow workers to secure a hook properly on a beam being lowered into the hold. The plaintiff was injured when the beam fell. Circuit Judge Moore there pointed out how old concepts of limited liability under the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. § 905) had been altered. In Alexander v. Bethlehem Steel Corp., 382 F.2d 963 (2d Cir.1967), the longshoreman was injured when a beam struck some dunnage and caused fragments of the dunnage to injure the plaintiff. The trial judge's failure to charge the jury concerning the distinction between unseaworthiness and operational negligence was held to have been justified by the *Mascuilli* decision. See also Venable v. A/S Det Forende Dampskibsselskab, 399 F.2d 347 (4th Cir.1968).

Under existing law, the S. S. Kathryn was therefore unseaworthy at the time of the injury to plaintiff, and the Bull Company must be held liable for the damages resulting from that injury.

### The Tester's Report

One of the facts pointing to operational negligence was the report of a test which showed that the port guy pendant was strong enough to move the unloaded boom without breaking. The stevedore, third-party defendant, attacks the admissibility of this report, because of the lack of eye-witness testimony that the cable tested was in fact from the Kathryn's guy pendant.

 Between the ship and I.T.O., the ship has the burden of proving that the stevedore's participation in the accident entitles the ship to indemnity. Even so, it is not necessary to prove each element of its case with absolute certainty. That standard is not required even in criminal cases. Mathes and Devitt, Federal Jury Practice and Instructions (1965) § 8.01.

The testimony of the director of the testing service, together with the internal evidence of his report, is persuasive that he was in fact testing a segment of the broken guy pendant. It was turned over to him by a Bull Lines employee a few days after the accident. The test report not only shows that the sample came from Bull Lines, but describes it as "Special Break, Side Guy Pennant." (sic) The description as to number of strands and quality of wire also conforms to the pendant of the S. S. Kathryn. There is no probable reason to believe that any other broken cable was tested for Bull Lines during the ten-day period after the accident.

Turning to the weight to be accorded to the tester's report, the third-party defendant mentions that the test related to the upper portion of the pendant, whereas it claims that the corrosion was near the bottom, where sea water would collect. However, a test of the unbroken portion was a logical way to determine the resistance to stress of the cable as it existed before the accident.

An important consideration is that the lower segment of the broken pendant was retained by I.T.O. It was lost when the gearshed in which it was stored changed hands. While its condition eight years later would of course have been changed, it was within I.T.O.'s power to have had an independent test made before it was lost.

The stevedore's pier superintendent testified that this segment was sent to the gear room "for evidence or something," and "was in there for years." If this piece would have shown that the pendant broke without any stress, it is strange that no evidence of the fact was preserved.

■ While there was oral testimony that the broken cable was rusty, it is not sufficiently persuasive to establish that the pendant would break under the normal weight of an empty boom.

### Indemnity

■ Generally, a stevedore must indemnify a ship owner against the consequences of the stevedore's mistakes.

The plaintiff here was aboard the S. S. Kathryn as an employee of I.T.O. I.T.O. was engaged in these stevedoring operations pursuant to a contract entered between it and A. H. Bull Steamship Co. and/or W. H. Bull & Co., Inc. on September 28, 1959. The parties agree that there is no express provision for indemnity for losses caused by personal injuries.

The Supreme Court has held that the stevedore's obligation to indemnify the vessel rests on an implied warranty of workmanlike service. In Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 133–134, 76 S.Ct. 232, 237, 100 L.Ed. 133 (1956), the Supreme Court said:

> "The shipowner here holds petitioner's [stevedore's] uncontroverted agreement to perform all of the ship owner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. * * * It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product."

■ This principle has been extended to include the use of equipment incident to stowage, as well as stowage itself. Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1968).

The negligence of the stevedore, involving improper use of a boom to move cargo in the hold which brought "into play the unseaworthy condition of the vessel," was held to be a breach of the stevedore's warranty of workmanlike service in Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 426, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). That case is directly controlling here. In that case, if the winch safety cut-off device had been properly set by the ship's crew, the forces which caused the parting of the topping lift would not have developed, since presumably the winch would have stopped applying force on the purchase within the limits of the safe working load of the equipment.

■ Clear provisions in a stevedoring contract disclaiming liability could perhaps negate the Ryan warranty. Pettus v. Grace Lines, Inc., 305 F.2d 151 (2d Cir.1962); Italia Societa, etc. v. Oregon Stevedoring Co., 336 F.2d 124 (9th Cir.1964).

The contract in effect between Bull Lines and I.T.O. contains a provision that

> "This contract constitutes the full agreement between the parties hereto, and no warranty of any nature is to be implied from any of the wording of this agreement." (¶ 21).

I.T.O. argues that this amounts to a disclaimer of the Ryan warranty.

This very provision was recently before Judge Weinfeld in Caputo v. Kheel, 291 F.Supp. 804 (S.D.N.Y.1968), involving this same ship. In deciding that Bull was entitled to indemnity for its expenses in resisting a claim by a longshoreman where the ship was found to be seaworthy and free of negligence, he said (p. 809):

> "This clause fails to meet the test which the courts have demanded: a clear and explicit agreement by the parties to eliminate an implied warranty that the stevedore will do his job in a workmanlike manner."

This court agrees with Judge Weinfeld that the parties have not negated the Ryan warranty in this contract. Paragraph 21, which is relied on by I.T.O., does not say that I.T.O. is absolved from the duty of workmanlike service. It is a very limited provision relating to implied warranties arising from the wording of the agreement. The warranty of workmanlike service derives from the nature of the relationship between the parties and should yield only to explicit and precise contractual terms.

The court, as indicated, is persuaded by the evidence that the direct cause of the injuries suffered by the plaintiff was the failure of the aft winchman to coordinate the operation of the two winches operating the lateral guys. Thus, even if the port pendant was somewhat defective, the accident would not have occurred but for the negligence of the stevedore. This brings the case clearly within the principle of Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445 (1959), and therefore Bull is entitled to indemnity from I.T.O.

### Attorney's Fees

Since we hold that the ship is entitled to indemnity from I.T.O., the judgment should include a provision that the ship be indemnified for reasonable attorney's fees and disbursements incurred by the ship. De Gioia v. U. S. Lines Co., 304 F.2d 421 (2d Cir.1962); Calderone v. Naviera Vacuba S/A, 328 F.2d 578 (1964). If agreement is not reached between attorneys for I.T.O. and the attorneys for the Bull Line's trustees, either party may request a hearing.

The judgment should contain appropriate authorization to the trustees in bankruptcy of Bull Lines, subject to the order of the bankruptcy court, to pay the amount of the judgment and enforce the indemnity against I.T.O.

This opinion shall serve as findings and conclusions pursuant to Rule 52(a) F.R.Civ.P.

Settle judgment on notice.