**E. H. BORM and C. D. Hammock,**
**Plaintiffs,**

**v.**

**CUNARD STEAMSHIP COMPANY, LIM-**
**ITED, in personam and M/V Mahout,**
**in rem, Defendants-Third Party Plain-**
**tiffs,**

**v.**

**TEXPORTS STEVEDORE COMPANY,**
**INC., Third Party Defendant.**

**Civ. A. No. 71-H-826.**

United States District Court,
S. D. Texas,
Houston Division.

Nov. 8, 1973.

Atreus M. Clay, Houston, Tex., for plaintiffs.

Fulbright, Crooker & Jaworski (Dixie Smith), Houston, Tex., for defendants-third party plaintiffs.

Royston, Rayzor, Cook & Vickery (Ken D. Kuykendall and Edward D. Vickery), Houston, Tex., for third party defendant.

## MEMORANDUM OPINION

SEALS, District Judge.

This is a suit in admiralty arising out of a maritime accident which occurred at the Port of Houston, Texas on No- vember 22, 1970 as a gang of longshore-men were unloading the M/V MAHOUT. During the unloading operation a section of the vessel's railing became dislodged and fell to the dock striking longshoremen E. H. Borm and C. D. Hammock who were working alongside the vessel. Borm and Hammock, Plaintiffs, sued the shipowner, Cunard Steamship Company Limited (Cunard) *in personam* and the M/V MAHOUT *in rem.* The Plaintiffs contended that the accident was caused by the shipowner's negligence and/or the unseaworthiness of the M/V MAHOUT.

Defendant Cunard filed a Third-Party Complaint against the Plaintiffs' employer, Texports Stevedore Company, Inc. (Texports). The Third Party Complaint, while denying any shipowner negligence or unseaworthiness, alleges that any injuries which may have occurred were caused by the failure of Third-Party Defendant Texports to fulfill its obligations to perform stevedoring services with reasonable care and reasonable prudence under the circumstances and in a reasonably safe and workmanlike manner. Cunard contends that Texports must indemnify it for any damages paid by it to Plaintiffs, including reasonable attorney's fees, court costs and disbursements.

Texports, the Third-Party Defendant, filed a counterclaim against Cunard urging that if Plaintiff's injuries were caused by unseaworthiness or shipowner negligence, the shipowner breached the express and/or implied contractual warranty of providing seaworthy equipment or was guilty of tortious conduct in failing to use due care under the circumstances and should indemnify Texports for compensation paid to Plaintiffs, court costs and disbursements, and reasonable attorney's fees. The Court has personal jurisdiction of all the parties to this suit and subject matter jurisdiction of the various claims under 28 U.S.C. § 1333 and 46 U.S.C. § 740.

As the trial in this case drew to a close Plaintiffs' claims against Cunard and the M/V MAHOUT were compro-

mised and settled. Accordingly, the Court entered an Order of Dismissal, dismissing Plaintiffs' causes of action against the Defendant with prejudice; Plaintiffs' costs to be borne by the Defendants. The Order was entered without prejudice to the Third-Party Plaintiffs' right to further prosecute its cause of action against the Third-Party Defendant or the Third-Party Defendant's right to assert its counterclaim against the Third-Party Plaintiff.

The facts are as follows: On November 22, 1970 at approximately 7:00 A. M., Borm, Hammock and the other longshoremen in a gang employed by Texports commenced unloading operations on the M/V MAHOUT, which was at all relevant times owned and operated by Cunard. The longshoremen worked throughout the day removing bundles of burlap bagging from the vessel's holds. At the time of the accident bagging was being removed from the forward end of the No. 5 lower hold.

This task necessitated the coordinated interaction of two of the ship's booms; the high boom or offshore boom, which is near the ship's center over the holds, and the inshore boom which is positioned nearer the ship's side and is capable of swinging out over the dock. Cables are suspended from each of the respective booms and are connected or married at the ends with shackles during this particular operation. Cargo is attached to the married cables through the use of bagging hooks which hang from the shackles. After the cargo is hooked by longshoremen working in the hold it is lifted out of the hold and clear of the hatch coaming by the offshore boom. Since the offshore boom is incapable of reaching the dock the inshore boom is brought into play at this point. The offshore boom simply keeps tension on the suspended cargo to keep it off the deck while the inshore boom pulls it clear of the vessel and deposits it on the dock. The cargo is then unhooked and the inshore boom lifts the hooking gear high enough to clear the ship's rail and

the offshore boom pulls the gear back aboard dropping it into the hold. It is undisputed that this is a customary and proper unloading procedure.

At approximately 5:30 P.M. longshoremen Jack Massey, Jr., the inshore winch operator, and Frank Biesenski, the offshore winch operator, discharged the last bundle of bagging scheduled to be removed from the MAHOUT. Borm and Hammock then performed the duty to which they were assigned that day of removing the bagging hooks from the cargo. Since this was the last bundle of cargo to be discharged Borm and Hammock unshackled the bagging hooks, which belonged to the stevedore, and remarried the ship's cables with the shackles, tightening the shackle pins finger tight.

After the cables were remarried H. A. Rodefeld, the gang foreman, ordered Biesenski to take in on the offshore boom winch and pull the married cables back aboard. At this point Borm and Hammock stooped over to pick up the bagging hooks which they had unshackled moments earlier. As the cables were being pulled aboard they came into contact with a removable section of the ship's rail. The removal section of railing became dislodged and fell to the dock striking both Borm and Hammock across the back.

Massey, the only person who actually saw the rail dislodged, testified that the head of one of the shackle pins caught the top of the rail as Biesenski snaked or dragged the married cables inboard over the rail with the offshore boom and winch. The rail was pulled slightly inward toward the hatch coaming and then flipped in the opposite direction toward the dock when the shackle pin slipped off. There is a factual controversy over whether the shackle snagged the top rail as Massey testified or one of the lower rails. The Court finds Massey to be a credible witness and accepts his version of the accident.

Cunard's indemnity claim is bottomed upon the breach of warranty

theory which emerged in Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1958). *Ryan* established that stevedores who go aboard vessels to perform stevedoring services warrant to the shipowner that the services will be performed in a workmanlike manner. If the stevedore breaches his warranty, and the breach proximately causes an injury for which the shipowner is held liable, the shipowner is entitled to indemnity, unless its own conduct is "sufficient to preclude indemnity." Weyerhaeuser Steamship Company v. Nacirema Operating Company, 355 U.S. 563, 567, 78 S. Ct. 438, 2 L.Ed.2d 491 (1958); W. J. Parfait v. Jahncke Service, Inc., No. 72–3316, 484 F.2d 296, 5th Cir. (1973). Cunard contends that Texports breached the warranty by dragging the married cables over the ship's rail and proximately caused the injuries to Borm and Hammock.

Texports denies any breach of the warranty of workmanlike performance (WWLP), contending that the method used for returning the ship's cables was reasonably safe and customary under the circumstances and that the injuries were caused by the failure of Cunard to properly secure the railing with locking pins. Texports insists that under the rationale of Marine Terminals v. Burnside Shipping Co., 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), Cunard must reimburse Texports for compensation paid to Plaintiffs Borms and Hammock by Texports plus court costs and attorney's fees. The Supreme Court recognized for the first time in *Burnside* that ". . . federal maritime law does impose on the shipowner a duty to the stevedoring contractor of due care under the circumstances, and does recognize a direct action in tort against the shipowner to recover the amount of compensation payments occasioned by the latter's negligence." *Burnside, supra* at 416, 417, 89 S.Ct. at 1151, 1152. This cause of action exists independent of any right of subrogation under workmen's compensation statutes.

In determining whether Cunard's claim for contract indemnity should be allowed this Court must engage in a weighing process evaluating the conduct of both parties to determine:

"1) Whether the warranty of workmanlike performance was breached;

2) Whether that breach proximately caused the injury; and

3) Whether the shipowner's conduct prevented the workmanlike performance."

Garner v. Cities Service Tankers Corporation, 456 F.2d 476 (5th Cir. 1972).

The shipowner carries the burden of proof on each of these issues. D/S A/S Sverre v. Texports Stevedore Co., Inc., S.D.Tex.1966, A.M.C. 2032, aff'd, 5th Cir. 1968, 387 F.2d 648, cert. den., 391 U.S. 914, 88 S.Ct. 1809, 20 L.Ed.2d 654 (1968).

Witnesses for both parties testified that the safest method of returning the married cables, or cargo falls as they were termed by various witnesses, is to lift upward with the inshore boom and winch until the offshore cable is clear of the railing and then pull both cables aboard with the offshore boom and winch. This is known as the Burton method or "Burton style." Texports contends however, that the method actually used, dragging with the offshore boom and winch, is the usual and customary method employed under the circumstances prevailing on the day in question.

Rodefeld, Massey and Borm were all of the opinion that there was not sufficient weight on the cables to permit their return "Burton style." After Borm and Hammock removed the bagging hooks there was no weight on the cables other than that provided by the two five-ton shackles. The longshoremen testified that absent more weight there would be a substantial risk of two-blocking if the cables were returned "Burton style." Two-blocking occurs when the rear being lifted goes aloft

and becomes entangled at the top of the boom. This is undesirable as the ship's crew would have to lower the boom to get the gear down. Under these conditions, the longshoremen contend, dragging is the customary practice.

Cunard introduced its own experts who testified that the longshoremen were wrong in their evaluation of the possibility of two-blocking. They contend that the two five-ton shackles provide more than sufficient weight. Further, they suggest that even if the risk of two-blocking eliminates the use of the Burton method there are other viable alternatives which are superior, from a safety standpoint, to dragging with the offshore boom and winch.

■ The Court is convinced that Texports breached its warranty of workmanlike performance in dragging the gear over the portable section of railing. After "weighing and sifting" the evidence, as Judge Goldberg put it in Southern Stevedoring and Contract Co. v. Hellenic Lines, Ltd., 388 F.2d 267 (5th Cir. 1968), it is apparent that dragging cables and shackles over a removable rail with a ship's winch capable of a five-ton pulling capacity while longshoremen stand on the dock beneath the rail is an unreasonably dangerous practice. The WWLP consists basically of a contractual obligation to perform duties under a contract with reasonable safety, *Weyerhaueuser, supra.* The Court accepts the testimony of Cunard's expert witnesses that the method used was not reasonably safe under the circumstances.

It is not suggested that the longshoremen should have attempted a "Burton style" return with the weight that was present, but only that some method more reasonable from a safety standpoint than dragging could and should have been used. The testimony indicates that several alternatives were available. More weight could have been added to permit a "Burton style" return. The ship's cargo hook, not to be confused with the bagging hooks provided by the stevedore, would have been sufficiently

heavy had it been attached to the cables. The longshoremen had removed the cargo hook earlier in the day as a matter of convenience since it was not needed in unloading bagging cargo. There is conflicting testimony as to whether the hook was placed on the deck when removed or placed on the dock first and then returned to the deck later by a crew member. Even assuming that it was taken from the dock to the deck by a crew member and thus was not immediately at hand to be reshackled by Borm and Hammock when they unshackled the bagging hooks, this does not excuse the use of an unsafe procedure such as dragging. The longshoremen could have carried the cargo hook back to the dock by hand or even deposited it on the dock by using the ship's booms and winches before the bagging hooks were unshackled. Nor is the addition of the cargo hook or some other weight the only alternative. Lines could have been attached to the cables by Borm and Hammock to provide sufficient pull against the inshore boom to prevent two-blocking, or, as one of the longshoremen testified, the cables could have been pulled aboard by hand.

Texports, in its Post Trial Memorandum states:

"Even if the Court finds that the conduct of the stevedore constituted a technical breach of the stevedore's warranty, the prerequisite causal connection between any such breach and the injuries is lacking and indemnity must be denied."

Texport's theory is that the rail was unseaworthy due to the absence of locking pins in the bottom of the rail stanchions, and but for the absence of these locking pins the force exerted by the shackle pin would not have dislodged the rail. The argument is that Texports

". . . could not reasonably foresee that the contact of the shackle with the removable rail would result in any injuries to the longshoremen or damage to property, and such contact would not have done so had the ship-

owner fulfilled its obligation to furnish the stevedore a seaworthy vessel."

The evidence indicates that the removable section of railing was not secured in place at the time of the accident by locking pins. The rail stanchions fit into sockets which are permanently attached to the deck. The stanchions and sockets are designed to permit the insertion of pins or bolts through the sockets and stanchions thereby locking the removable section into place. If the pins are in place they would have to be sheared before the railing could be dislodged. The absence of any sheared pins in the area surrounding the sockets plus the fact that the rail was not severly bent, as expert witnesses indicated it would have been had locking pins been in place, leads this Court to the conclusion that the rail was not secured with pins or bolts, and that the M/V MAHOUT was unseaworthy.

Quite probably this particular accident would not have occurred in this particular manner had the locking pins been in place, but, it is abundantly clear that *but for* the longshoremen negligently dragging the gear over the railing no accident would have occurred at all. Texports' negligence constituted a breach of the WWLP and proximately caused the rail to fall upon Borm and Hammock. Texports could reasonably foresee that contact between gear being pulled aboard the ship by a five-ton winch and a removable section of the ship's railing, even if that section of railing is properly locked into place, is an unsafe practice likely to lead to property damage and/or personal injury.

■ Stevedore negligence, which constituted a breach of the WWLP, brought an unseaworthy condition into play resulting in injuries to Borm and Hammock. The Supreme Court held in Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), that under these circumstances the shipowner is entitled to recover over. In an attempt to remove the instance case from the ambit of *Crumady* Tex-

ports argues that *Crumady* controls only if the unseaworthy condition is dormant and does not apply if the condition is latent. The Court agrees that the condition of the rail was in fact latent in the sense that it would not have been discernible by a reasonable, but cursory, inspection by the stevedore. The Court does not agree, however, that *Crumady* is inapplicable under these facts.

Primarily Texports relies on Lamar v. Admiral Shipping Corp., 476 F.2d 300, 5th Cir., 1973, where the Court of Appeals for the Fifth Circuit stated in part:

"The legal principles to be applied in determining the question of liability for indemnity for the breach of the WWLP are now so well settled that we forego a discussion of them at length. It is enough to say that in the factual context of this case even though the vessel's equipment is unseaworthy, 'if the stevedore brings this condition into play, he is liable to indemnify the owner for any damages which may be sustained because of the breach of warrant.' Crumady v. 'The Joachim Hendrik Fisser,' 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. But the stevedore is chargeable only with knowledge of defects discernible by a reasonable, but cursory, inspection and is not responsible for latent defects. Vacaro v. Alcoa Steamship Co., 2 Cir. 1968, 405 F.2d 1133. See Delaneuville v. Simonsen, 5 Cir. 1971, 437 F.2d 597. 'There is a related rule that defects which are in fact observed cannot be overlooked. If the stevedore has knowledge of a defect he should correct it or require it to be corrected by the ship's officers.' T. Smith & Son, Inc. v. Skibs A/S Hassel, 5 Cir. 1966, 362 F.2d 745."

When properly understood in its factual context this language in *Lamar* does not stand for the proposition asserted by Texports. It does not indicate that *Crumady* is inapplicable in all situations where the unseaworthy condition is latent. The shipowner in *Lamar* had urged that the stevedore was negligent

in sending longshoremen across a gangway which was obviously damaged. The determination of whether the stevedore was negligent and whether the WWLP was breached turned upon whether the stevedore could be charged with knowledge that the gangway was defective. The issue of whether the defect was latent or whether it was discernable by a reasonable, but cursory, inspection would necessarily be crucial to a finding that the WWLP had been breached.

 In the present case the WWLP would have been breached regardless of whether the rail was pinned or not. Dragging gear over a removable section of railing is an inherently dangerous and unreasonable practice even if the rail is completely seaworthy. Nothing in *Crumady* implies that indemnity is necessarily precluded if the unseaworthy condition is latent. "It appears from the cases that any unreasonable action by a stevedore which activates or exacerbates a *latent* or manifest condition of unseaworthiness will establish the shipowner's right to indemnification." Humble Oil & Refining Company v. Philadelphia Ship Maintenance Co., Inc. 444 F.2d 727, 731 (3rd Cir. 1971) [Emphasis supplied]. Acts or omissions by the stevedore which are totally independent of any failure to discover obvious defects can serve as a basis for stevedore liability under *Crumady* if those acts or omissions bring an unseaworthy condition into play. See generally, Kaminski v. A/B Svenska Ostasiatiska Kompaniet, 445 F.2d 398 (3d Cir. 1971); United States Lines Co. v. King, 363 F.2d 658 (4th Cir. 1966); Calmar Steamship Corp. v. Nacirema Operating Co., 266 F.2d 79 (4th Cir. 1959); Brattoli v. Kheel, 302 F.Supp. 745 (E. D.N.Y.1969).

 Going to the third phase of the inquiry demanded by Garner v. Cities Service Tankers Corp., *supra*, this Court is convinced that the shipowner's conduct did not prevent the workmanlike performance. The injury would not have occurred had Texports rendered a workmanlike performance and avoided dragging the gear over the removable railing with a five-ton winch. Some of the responsibility for this accident falls on both parties but unfortunately damages cannot be divided between them. Recognizing this problem the Fifth Circuit recently stated in W. J. Parfait v. Jahncke Service, Inc., No. 72–3316, 484 F.2d 296 (1973):

"This Court has previously recognized the 'equitable spirit behind the *Ryan* doctrine.' Whisenant v. Brewster-Bartle Offshore Company, supra, 446 F.2d 394, at 400. Its purpose is generally to place 'the burden ultimately on the company whose default caused the injury.' Italia Societa v. Oregon Stevedoring Company, supra, 376 U.S. 315, at 324, 84 S.Ct. 748, at 754, 11 L.Ed.2d 732. The *Ryan* doctrine is not, however, a precision instrument for allocating the burden according to the relative amounts of faults, but a rought all-or-nothing device. Even where the shipowner and the contractor are both at fault, under the *Ryan* warranty doctrine indemnity will be allowed wholly or not at all, as the trier of fact may determine by weighing the conduct of the two parties as described above."

The weighing process has been undertaken, and, all evidence considered, the Court concludes that Cunard is entitled to indemnity.

The Court is also convinced that under these facts Texports is not entitled to any recovery on its counterclaim against Cunard. In Marine Terminals v. Burnside Shipping Co., *supra,* the Supreme Court recognized that the stevedore has a direct action in tort against the shipowner to recover compensation payments occasioned by the latter's negligence. Here the accident was proximately caused by stevedore negligence which brought an unseaworthy condition into play. The absence of locking pins rendered the ship unseaworthy, but the evidence does not indicate that the shipowner breached the duty of exercising reasonable care under the circumstances.

■ Texport's counterclaim also seeks recovery on a contract indemnity theory. The question of whether a stevedore could maintain a direct action on a claim of this nature was expressly left open by the Supreme Court in Marine Terminals v. Burnside Shipping Co., *supra*. Assuming, without deciding, that there are contractual warranties running from the shipowner to the stevedore, and that the stevedore can maintain an action on a contract indemnity claim, this Court can conceive of no warranty broad enough to permit an indemnity award on the facts of this case. To reiterate, compensation payments were occasioned in the present case by the negligence of Texports—not by the negligence of Cunard.

The Clerk will file this Memorandum Opinion and furnish counsel for all parties with true copies.